1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

Meridian Sunrise Village, LLC

CASE NO. 13-5503RBL

MERIDIAN SUNRISE VILLAGE, LLC,

BANKRUPTCY NO. 13-40342-BDL

10

Debtor.

ADVERSARY NO. 13-04225-BDL

11

12

_____

OPINION AFFIRMING
CONFIRMATION OF MERIDIAN'S
REGORANIZATION PLAN

13

MERIDIAN SUNRISE VILLAGE, LLC,

[DKT. #31]

14

Appellee,

15

v.

16

NB DISTRESSED DEBT INVESTMENT
FUND LIMITED, et al.,

17

Appellants

18

19

## I. INTRODUCTION

20

THIS MATTER is before the Court on Funds' Appeal of the Bankruptcy Court's

21

Preliminary Injunction, precluding the Funds from voting on Debtor Meridian's Chapter 11

22

reorganization plan, and on its subsequent Confirmation of that Plan. [Dkt. #31.]

23

24

1   The issue there, and here, is whether the Funds (broadly, hedge funds that acquire

2   distressed debt and engage in predatory lending) were Eligible Assignees of the Debtor's loan

3   obligation under the original Loan Agreement.

4   Because the Bankruptcy Court properly determined that they were not, its refusal to

5   permit them to vote on the Reorganization Plan was correct, as was its confirmation of that Plan.

6   Additionally, and in any event, Meridian is correct in its contention on appeal that even if the

7   Funds were eligible assignees, they would have only been entitled to only one vote between

8   them.  The reorganization plan would have been confirmed, even if the Funds were permitted to

9   vote.  The Bankruptcy Court's Orders are AFFIRMED.

10                                  **II. BACKROUND**

11   In April 2008, Meridian borrowed $75,000,000 from U.S. Bank for the construction of

12   Sunrise Village, a Puyallup shopping center.  The parties' negotiated Loan Agreement included a

13   limitation on the bank's ability to assign the loan to other entities:

14           No Lender shall at any time sell, transfer or assign any portion of the Loan (each such
             interest so disposed of being herein called a "Transferred Interest") to any Person other than
15           an Eligible Assignee (hereinafter called a "Transferee").

16   Loan Agreement at § 13.2.  This dispute centers on the definition of "Eligible Assignees", and

17   specifically, "financial institutions":

18           "Eligible Assignee" means any Lender or any Affiliate of a Lender or any commercial
19           bank, insurance company, financial institution or institutional lender approved by Agent in
             writing and, so long as there exists no Event of Default, approved by Borrower in writing,
20           which approval shall not be unreasonably withheld.

21   Loan Agreement § 1.1.

22   Based on prior negative experiences, Meridian specifically limited "Eligible Assignees"

23   to commercial banks, financial institutions, or institutional lenders to avoid future assignments to

24

1  predatory investors—investors who purchase distressed loans in the hope of obtaining control of

2  the underlining collateral in order to liquidate it for rapid repayment.

3       U.S. Bank soon assigned portions of the loan to Bank of America ("BoA"), Citizens

4  Business Bank ("Citizens"), and Guaranty Bank and Trust Company ("Guaranty") (collectively,

5  the "Lender Group").  Throughout the next few years, Meridian remained current on its loan

6  payments.  Nevertheless, in early 2012, the Lender Group forced Meridian into a nonmonetary

7  default based on the economic recession and debt coverage under the loan agreement.  It did not

8  charge Meridian the default interest rate at the time.  It did, however, take steps to sell the loan.

9  In late 2012, U.S. Bank requested that Meridian agree to waive the "Eligible Assignee"

10 limitations to facilitate such a sale.  Because Meridian purposely negotiated the limitations to

11 prevent assignments to predatory investors, it declined.

12      For the next month, Meridian and U.S. Bank debated eliminating the Eligible Assignee

13 restrictions.  U.S. Bank ultimately threatened to enforce its rights—presumably, to charge the

14 higher, default interest rate—if Meridian did not acquiesce, but Meridian refused.  In January

15 2013, U.S. Bank informed Meridian that it would immediately begin charging the default interest

16 rate (20 percent of the loan's total outstanding balance).  The default interest totaled an

17 additional $250,000 per month, which Meridian did not have.  Meridian consequentially filed for

18 protection under Chapter 11 of the Bankruptcy Code.

19      As part of its Chapter 11 reorganization, Meridian created a Reorganization Plan that

20 categorized the Lender Group as a specific class for the purpose of voting on the Plan.  Prior to

21 the vote, and in defiance of Meridian's repeated objections, BofA transferred its interest to NB

22 Distressed Debt Limited Fund.  NB Distressed boasted that it "provide[d] investors with

23 attractive risk-adjusted returns through long-biased, opportunistic stressed, distressed and special

24

1   situation credit-related investments while seeking to limit downside to risk." *See* ER 134-135.

2   NB Distressed subsequently assigned one-half of its interest to Strategic Value Special Situations

3   Master Fund II, L.P., and another part of its interest to NB Distressed Debt Master Fund LP.

4   These three entities (collectively, the "Funds") focus on acquiring distressed debt, and are

5   precisely the types of entities to which Meridian claims the Loan Agreement prohibits

6   assignment.

7          Meridian immediately objected to BoA's transfer to NB Distressed.  On May 23, 2013,

8   Meridian asked the Bankruptcy Court to enjoin the Funds from exercising Eligible Assignee

9   rights, including most importantly, voting on its proposed Reorganization Plan.  The Bankruptcy

10  Court granted the injunction, and the Funds appealed to this Court, seeking a stay of the

11  Bankruptcy Court's preliminary injunction.  This Court granted the Funds' Motion for Leave to

12  Appeal the preliminary injunction, but denied the Funds' Motion to Stay. [Dkt. # 15.]  The

13  Lender Group supported and voted in favor of Meridian's Reorganization Plan. The Funds were

14  not permitted to vote.  In September 2013, the Bankruptcy Court confirmed the Plan.

15         The Funds now appeal the Bankruptcy Court's Preliminary Injunction and confirmation.

16  The Funds argue that the definition of "financial institution" (in the Loan Agreement to which

17  they were not a party) was broad, even limitless.  Accordingly, they argue that Bankruptcy Court

18  erred in determining that they were not a financial institution, and subsequently erred in

19  confirming a plan that did not include the Funds' vote.  This dispute centers on the definition of

20  "Eligible Assignees," and specifically, "financial institutions."

21                                    **III. DISCUSSION**

22  **A.  Standard of Review**

23         Meridian argues that the appropriate standard of review is abuse of discretion.  The Funds

24  counter that the correct standard is *de novo*, because the issuance of the preliminary injunction

1  depended on the bankruptcy court's contract interpretation.  Because the outcome of this case

2  turns on the interpretation of "financial institution," *de novo* is the correct standard of review.

3         Although a trial court's decision to issue a preliminary injunction may be reviewed under

4  an abuse of discretion standard, appellate courts must review matters of contract interpretation *de*

5  *novo*. *See In re Brawders*, 503 F.3d 856, 866 (9th Cir. 2007); *Am. W. Airlines, Inc. v. Nat'l*

6  *Mediation Bd.*, 986 F.2d 1252, 1258-59 (9th Cir. 1992); *L.K. Comstock & Co. v. United Eng'rs*

7  *& Constructors, Inc.*, 880 F.2d 219, 221 (9th Cir. 1989).  Both parties agree that the

8  interpretation of "financial institutions' lies at the heart of the dispute.  The appropriate standard

9  of review is *de novo*.

10 **B.  The Bankruptcy Court correctly interpreted the term "financial institutions."**

11        The Loan Agreement limits loan assignments to "Eligible Assignees," which includes

12 (only) "commercial banks, insurance companies, financial institutions, or institutional lenders."

13 Meridian argues that that the plain language of the Loan Agreement's limitations, the specific

14 text surrounding financial institutions, and the parties' actions all prove that the parties intended

15 financial institutions to exclude entities like the Funds.  The Funds claim that "financial

16 institutions" should be read much more broadly, and should include any and all enterprises that

17 specialize in the handling and investment of funds.

18        The goal of contract interpretation is to "ascertain the intention of the parties." *Berg v.*

19 *Hudesman*, 115 Wash.2d 657, 663 (1990) (quoting Corbin, *The Interpretation of Words and the*

20 *Parol Evidence Rule*, 50 Cornell L.Quar. 161, 162 (1965)).  In Washington, courts determine the

21 parties' intent by examining the contract's objective manifestations.  *Hearst Commc'ns, Inc. v.*

22 *Seattle Times Co.*, 154 Wash.2d 493, 503 (2005).  Words should be given their ordinary, usual

23 and popular meaning "unless the entirety of the agreement clearly demonstrates a contrary

24

1    intent." *Hearst Commc'ns, Inc.*, 154 Wash.2d at 504.  Subjective intent is generally irrelevant if

2    the intent can be determined from the actual words used. *Id.*

3          In determining the objective intent, courts may refer to extrinsic evidence for the

4    "meaning of specific words and terms used." *Id.* at 503 (quoting *Hollis v. Garwall, Inc.*, 137

5    Wash.2d 683, 695-96 (1999)).  The Court may rely on extrinsic evidence even in the absence of

6    ambiguity. *See Berg*, 115 Wash.2d at 669. Extrinsic evidence may include: "(1) the subject

7    matter and objective of the contract, (2) all the circumstances surrounding the making of a

8    contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of

9    respective interpretations urged by the parties." *Hearst Commc'ns, Inc.*, 154 Wash.2d at 502

10   (citing *Berg*, 115 Wash.2d at 667).  Extrinsic evidence may not be used to "show an intention

11   independent of the instrument" or to "vary, contradict, or modify the written word." *Hearst*

12   *Commc'ns, Inc.*, 154 Wash.2d at 503 (quoting *Hollis*, 137 Wash.2d at 695-96). The interpretive

13   tool that examines the entire subject matter of the contract is the doctrine of *noscitur a sociis*.

14   *Noscitur a socciis* requires the interpretation that best harmonizes the interpreted word with the

15   surrounding context. *State v. Jackson*, 137 Wn.2d 712, 729 (1999).

16      1.   The Ordinary Meaning of the Term "Financial Institutions" as Used in the Loan
             Agreement Excludes the Funds.

17          Meridian argues the plain meaning of "financial institutions" is readily apparent from the

18   "Eligible Assignee" definition as a whole in the Loan Agreement, the specific text surrounding

19   "financial institutions," and the parties' actions.  The Funds claim that "financial institutions"

20   should be defined by common (Webster's) and legal (Black's) dictionaries, which include any

21   and all institutions that handle and invest funds.

22          It is clear to this Court that the parties to the Loan Agreement contemplated that the

23   Funds were ***not*** included in the definition of "Eligible Assignees."  First, if the parties had

1    intended "financial institutions" to mean what the Funds claim it means—any entity that

2    manages money—then Bank of America was free to assign the loan to virtually any entity that

3    has some remote connection to the management of money—up to and including a pawnbroker.

4    The Agreement's assignment "limitation"—a term the Debtor claims was material—would have

5    no limiting effect at all.  Indeed, under the Funds' broad definition, any *individual* person could

6    start an LLC online in thirty minutes, and the fly-by-night entity would be a "financial

7    institution" to which BofA could assign the loan. Thus, the Funds' definition drains any force

8    from the limitation.

9            Second, as the Bankruptcy Court recognized, the remaining phrases in the limitation

10   would have no meaning if the term "financial institution" was as broad as the Funds now claim.

11   [*See* Transcript Preliminary Injunction hearing, Dkt. #4 at Ex. 2, pp. 46-47.]  The *noscitur a*

12   *sociis* doctrine requires that a word be interpreted in such a way that harmonizes with its context.

13   "Financial institution" harmonizes with "commercial bank," "insurance company" and

14   "institutional lender" when interpreted to mean "entities that make loans."  The Loan Agreement

15   listed "financial institutions" in the midst of entities specifically dealing with money lending, and

16   so interpreting "financial institutions" as any entity that manages money would render the

17   surrounding words, and the clause itself, nonsensical.

18       2.   Extrinsic Evidence Proves That Parties Understood "Financial Institutions" To Exclude
            The Funds

19

20           The Funds argue that only the abstract dictionary definition may be considered when

     interpreting "financial institutions."  Meridian argues that the parties' actions also shed

21   evidentiary light on the parties' intended meaning of "financial institutions," and should be

22   considered.

23

24

1    Even the Funds' authority clearly allows for the consideration of extrinsic evidence when

2    determining the meaning of specific phrases.  *See Hearst Commc'ns, Inc.*, 154 Wash.2d at 503

3    ("Since *Berg*, we have explained that surrounding circumstances and other extrinsic evidence are

4    to be used 'to determine the meaning of *specific words and terms used*' and not to 'show an

5    intention independent of the instrument' or to 'vary, contradict, or modify the written word.'")

6    (emphasis in the original).

7    U.S. Bank's (the assignor of BoA's initial loan commitment) own actions bolster

8    Meridian's argument that "financial institutions" intentionally excluded entities like the Funds.

9    U.S. Bank sought in writing to eliminate all restrictions on whom or what could be an Eligible

10   Assignee, and it did so prior to the assignment to the Funds.  Not only did both parties recognize

11   that the definition was intentionally narrow, but Meridian claims that U.S Bank and the Lender

12   group knew of its materiality to the Loan Agreement.  Meridian argued that it demonstrated the

13   importance of the "Eligible Assignee" restrictions when it opted to file Chapter 11 bankruptcy

14   instead of submit to U.S. Bank's demands.  U.S. Bank's attempts at removing the "Eligible

15   Assignee" restrictions served as "powerful evidence that the parties to the agreement meant to

16   (and did) limit the list to lenders, and to exclude assignment to distressed asset hedge funds who

17   candidly admit they seek to "obtain outright control" of assets." [Dkt. # 15, pg. 5, 1-3.]

18   The purposefully limiting effect of the "Eligible Assignee" definition, the text

19   surrounding "financial institution," and U.S. Bank's unsuccessful attempts to eliminate the

20   restrictions all indicate that the parties intended "financial institutions" to exclude the Funds.

21   Accordingly, the Bankruptcy Court properly concluded that the Funds did not qualify as

22   "Eligible Assignees."

23

24

**C.  The Funds were properly precluded from voting on the Reorganization Plan**

Because the Funds were not "financial institutions" under the Loan Agreement, they were not "Eligible Assignees."  The Loan Agreement permitted only "Eligible Assignees" to vote on the Plan, and thus the Funds were rightfully precluded from voting.

Meridian also argues, and U.S. Bank agrees, that even if the Funds were "Eligible Assignees," they are not each entitled to vote on the Reorganization Plan.  Instead, they claim, the Funds should together be entitled only *one* vote (and not to the three that the Funds claim).

When creating a reorganization plan, a debtor may separate its creditors into different classes.  *See* 11 U.S.C. 1122.  Courts may confirm a reorganization plan if at least one impaired class votes to accept it. *See* 11 U.S.C. 1129(a)(10).  A class is deemed to have accepted the plan when has the plan receives over fifty percent of class member *votes* and at least two-thirds of the claimed dollar *amount*. *See* 11 U.S.C. § 1126(c).

Meridian organized a class that included U.S. Bank, Citizens, Guaranty, and BofA.  Each entity had one vote, and the Funds' interest in the loan originally stemmed from BofA's rights.  A creditor does not have the right to split up a claim in such a way that artificially creates voting rights that the original assignor never had.  If the Funds' reading was correct, any voter could veto the Plan by assigning its claim to enough assignees.

This arbitrary increase in voting power would prevent the remaining members of the class from accepting a plan without the Funds' support, which would nullify the Bankruptcy Code's voter majority requirement. If the Funds received the number of votes it desired by simple assignment, any creditor could assign its interest to multiple parties to increase its voting power.  U.S. Bank is correct that "the numerosity requirement cannot be so easily manipulated." [Dkt. # 41, pg. 4, 33.]  The interest of fairness and statutory authority requires that the Funds, if deemed "Eligible Assignees," must only receive one vote.

1    Therefore, even if the Funds were eligible to vote, they—together—would have been

2    entitled to only one vote, representing the share of debt they purchased.  That vote, even if cast in

3    opposition to the Plan, would not have changed the outcome.

4                                    **IV. CONCLUSION**

5    The Bankruptcy Court properly interpreted "financial institutions" to exclude the Funds,

6    based on the clear meaning of the definition's limitations, the text surrounding "financial

7    institutions," and the parties' actions.  Furthermore, even if the Funds were eligible to vote, their

8    one vote would not have changed the outcome of the Plan's vote.  Accordingly, the Bankruptcy

9    Court's confirmation of the Plan is AFFIRMED.

10   IT IS SO ORDERED.

11   Dated this 6th day of March, 2014.

13

14

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE